UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NATIONAL DEVELOPMENT | : | |
| GROUP, INC., | : | |
| | : | CIVIL ACTION NO. 12-CV-946-S |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| HARLEYSVILLE PREFERRED | : | |
| INSURANCE COMPANY, | : | |
| | : | |
| *Defendant*. | : | August 29, 2014 |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Harleysville Preferred

Insurance Company ("Harleysville" or "Defendant") submits this Memorandum of Law in

Support of its Motion for Summary Judgment.

## INTRODUCTION

Plaintiff, National Development Group, LLC ("Plaintiff") is the owner of a three-story

apartment building located at 528 Smithfield Rd., North Providence, Rhode Island (hereinafter,

the "Property").  Harleysville insured the Property under Commercial Property policy number

MP 0000000025700F, in effect from June 15, 2010 to June 15, 2011 (hereinafter, the "Policy").

On or about February 5, 2011, the Property allegedly sustained damage to the shingles covering

the gambrel-style hip roof that covered the third floor (the "Mansard Roof") and an awning

located over the front entry of the building (the "Awning").  The damage was purportedly caused

by ice and snow buildup.  Six months later, on July 19, 2011, Plaintiff made a claim under the

Policy for the property damage.

Thereafter, a dispute arose between the parties concerning the scope and value of the

claim and Plaintiff commenced this lawsuit.  In its Complaint, Plaintiff alleges that Harleysville breached the Policy by refusing to pay the cost to replace the shingles for both the Mansard Roof and the primary roof covering the top of the building (the "Main Roof").  Plaintiff does not contend that the shingles on the Main Roof was damaged as a result of the February 2011 loss. Rather, Plaintiff contends that Rhode Island Insurance Regulation 73, Section 9[1] requires Harleysville to replace the Main Roof shingles so that it will match the Mansard Roof.

Further, during this litigation, and unbeknownst to Harleysville, Plaintiff made repairs to the north side of the Mansard Roof.  While making these repairs, Plaintiff found significant wood rot in the decking and structural members of that section of the Mansard Roof and some rot on that section of the Main Roof.  Plaintiff completely rebuilt the entire section of the Mansard Roof (and some decking from north side of the Main Roof) and destroyed the rotted wood without providing Harleysville an opportunity to inspect the damage to determine if it was a covered loss.  Plaintiff nevertheless contends that the costs it incurred to repair and rebuild the sections of the Mansard Roof and Main Roof should be reimbursed by Harleysville under the Policy.

As explained below, Plaintiff's claim for breach of contract fails as a matter of law.  First, regarding the Mansard Roof shingles and Awning, Harleysville does not dispute coverage for that portion of the claim, but rather the parties disagree as to what it will cost to replace the Mansard Roof shingles and Awning.  The Policy provides that disputes over the value of repairs or replacement of damaged property are to be submitted to appraisal.  Here, Harleysville requested appraisal both before and during this Litigation, but Plaintiff steadfastly refused.

---

[1] Insurance Regulation 73:9 (Standards for Prompt, Fair and Equitable Settlements Applicable to Fire and Extended Coverage Type Policies with Replacement Cost Coverage) is the current manifestation of Regulation 73:8(A), cited in Plaintiff's Complaint.  Regulation 73 was re-numbered and amended effective February 2014, but with no substantive change to the provisions of Section 8.

Plaintiff cannot, as a matter of law, now prevail on its breach contract claim when it - and not Harleysville – has refused to comply with an express condition of the Policy.

Next, Plaintiff's claim for the cost to replace the Main Roof shingles fails as a matter of law because Regulation 73:9 does not provide for a private right of action.  Further, even if Regulation 73:9 did provide such a right, it does not require that Harleysville replace the Main Roof shingles so that it would match the Mansard Roof *when they did not match before the loss*. Indeed, the undisputed evidence demonstrates that: (i) the shingles on the Mansard Roof were a different color than the shingles on the Main Roof prior to the loss in question; and (ii) the Main Roof itself did not have a "uniform appearance" prior to the loss because it was comprised of a patchwork of different colored shingles.  Consequently, Plaintiff's claim regarding the Main Roof fails as a matter of law.

Finally, Plaintiff's claim for the cost to replace the "rotted" underlying roof decking and structural elements also fails as a matter of law.  Indeed, Plaintiff failed to notify Harleysville of this damage and did not provide Harleysville with an opportunity to inspect the damage to determine:  (i) whether the damage was a covered loss under the Policy; and (ii) whether the scope and cost of the repairs being performed were appropriate.  As a result, Plaintiff violated express conditions to coverage under the Policy.  Because Harleysville was significantly prejudiced by Plaintiff's failure to notify and cooperate, Plaintiff is now precluded from obtaining coverage for these costs of repair under the Policy.

## UNDISPUTED FACTS

## I.        The Condition of the Property

1.        The Property is designed with two distinct roofing systems: (i) the Main Roof, a minimally sloped roof that covers an area of approximately 15,000 square feet over most of the

3

footprint of the Property; and (ii) the Mansard Roof, which covers approximately 5800 square feet on the four sides of the third-floor of the Property. **Exhibit E** (D. Quinn's Report and Estimate, Photograph of Building p. 14, dated November 17, 2011)[2]; **Exhibit D** (Weisman Roofing Proposal and Contract). The east side entryway to the Property features a canvas awning. **Exhibit E** (D. Quinn's Report and Estimate, Photograph of Awning p. 14, dated November 17, 2011); **Exhibit F** (D. Quinn Deposition 35:9-13).

On and after July 19, 2011, when Plaintiff notified Harleysville of its claim, the Mansard Roof was covered with three tab asphalt roofing shingles that were silver lining in color. **Exhibit G** (G. Chandler Inspection Report and Estimate, dated February 6, 2012); **Exhibit H** (D. Grandpre Report, dated February 9, 2012, p. 2).

At the time Plaintiff notified Harleysville of the Mansard Roof claim, the Main Roof was covered with multiple different colors and types of roofing shingles. The predominant covering was white asphalt shingles, but portions of the Main Roof were covered with architectural style composite shingles, black asphalt shingles, and gray shingles. Some portions of the Main Roof were not covered with shingles at all, but were covered with black rolled roofing. **Exhibit I** (G. Chandler Deposition Vol. I, 21:9, 22:4-6; **Exhibit G** (G. Chandler Inspection Report and Estimate, dated February 6, 2012); **Exhibit J** (R. Juchnik Deposition 132:20-25); **Exhibit H** (D. Grandpre Report, p. 2 and Photographs Depicting Mis-matched Main Roof Repairs, Attachments 1, pp. 1-17); **Exhibit K** (P. Zompa Deposition 31:24-32:19); **Exhibit L** (D. Grandpre Deposition 48:9-49:6, 50:15-22). The Mansard Roof and Main Roof did not match. **Exhibit G** (G. Chandler Inspection Report and Estimate, dated February 6, 2012). **Exhibit H** (D. Grandpre Report, dated February 9, 2012, p. 2).

---

[2] **Exhibits A** through **AA** are attached to Harleysville's Statement of Undisputed Facts.

Prior to February 2011, Plaintiff's maintenance supervisor, Peter Zompa ("Zompa"), and others, patched the main roof on numerous occasions with shingles that did not match the original shingles.  **Exhibit K** (P. Zompa Deposition 31:24-32:19).  In particular, Zompa replaced shingles on the Main Roof in 2010 using gray shingles that did not match the existing shingles.  *Id*. at 33:1-6.  Additionally, at least two other repair / replacement projects took place on the Main Roof using shingles that did not match the original shingles.  *Id.* at 32:4-7.  Within 7-10 days of the February 2011 storm, Zompa replaced two bundles worth of shingles on the Main Roof with shingles that, again, did not match the original existing shingles.  *Id.* at 44:6-13, 45:2.  Zompa confirmed that the repair he made to the main roof following the February storm was a "good repair" and that there was no discernible remaining damage. *Id*. at 58:8-62:24.

Between July and September of 2013, Plaintiff effected repairs on the north face of the Mansard Roof.  **Exhibit M** (D. Scungio Deposition 44:6-11).  Plaintiff bought, and installed Certainteed XT30 Gray Frost asphalt shingles that generally matched the pre-existing silver lining shingles covering the remaining faces of the Mansard Roof.  **Exhibit N** (Invoices for Shingles, Plaintiff's Supplemental Document Production, Bate Stamped #74-75).

Also between July and September of 2013, Plaintiff replaced sections of the Main Roof with new shingles.  Plaintiff bought, and installed Certainteed XT30 Star White shingles.  The Certainteed Star White shingles are white in color and they do not match the Gray Frost shingles on the Mansard Roof.  The sections of the Main Roof that were repaired in 2013 have an approximate total area of 1716 square feet (52 bundles of shingles worth).  **Exhibit M** (D. Scungio Deposition 36:12-17, 38:4-6); **Exhibit N** (Invoices for Shingles, Plaintiff's Supplemental Document Production, Bate Stamped #76-79).

While removing the shingles on the north face of the Mansard Roof in 2013, Plaintiff's

contractor (David Scungio) discovered damage to the underlying plywood roof decking and the wood framing for the Mansard Roof.  The damage was in the form of wood rot.  **Exhibit M** (D. Scungio Deposition 38:4-12, 41:21-42:3, 52:5-8, 68:1-69:12).

Plaintiff undertook to remove the framing and decking for the north face of the Mansard Roof during the late summer of 2013, specifically July through September.  **Exhibit M** (D. Scungio Deposition 60:25-61:2); **Exhibit N** (Plaintiff's Supplemental Document Production, Bate Stamped #133-135).  The framing and decking wood that was removed from the north face of the Mansard Roof during the late summer of 2013 was placed in a dumpster that was taken off-site and disposed of, on or before August 6, 2013. **Exhibit N** (Invoice for Dumpster, Plaintiff's Supplemental Document Production, Bate Stamped #126-129).

While removing shingles from the Main Roof in 2013, David Scungio discovered damage to the underlying plywood roof decking and the wood rafters for the Main Roof.  The damage was in the form of wet plywood and some rotted plywood. **Exhibit M** (D. Scungio Deposition 50:13-51:12); **Exhibit O** (C. Colardo Deposition 146:13-147:5). Plaintiff undertook to remove the damaged decking and rafters of the Main Roof during the late summer of 2013. *Id*.  The framing and decking wood that was removed from the Main Roof in August of 2013 was placed in a dumpster that was taken off-site and disposed of, on or before August 6, 2013. **Exhibit N** (Invoice for Dumpster, Plaintiff's Supplemental Document Production, Bate Stamped #126-129).

Plaintiff rebuilt the wood framing and decking for the north face of the Mansard Roof and the Main Roof sections during August-September 2013, and covered both roof areas with new shingles, as outlined above.  **Exhibit M** (D. Scungio Deposition 50:2-8, 60:6-61:2).

Harleysville first became aware of the roof framing/decking damage on or about

September 27, 2013, during discovery in this litigation, well after the damaged wood was removed from the site and destroyed, and well after the replacement shingles were applied to the roofs. **Exhibit P** (Plaintiff's Supplemental Responses to Request for Production); **Exhibit N** (Plaintiff's Supplemental Document Production, Bates stamped #70); **Exhibit O** (C. Colardo Deposition 147:13-148:10).

When Scungio completed the work at the Property, the Mansard Roof and the Main Roof were both completely and adequately repaired and they were in "very good shape." **Exhibit M** (D. Scungio Deposition 41:21-43:25, 74:23-75:9).

## II.    <u>The Policy</u>

The Property is insured under the Harleysville Policy for "direct physical loss or damage … caused by or resulting from any Covered Cause of Loss." **Exhibit B** (Policy, Coverage A).

The Policy limit for the Property is $11,761,001, subject to a 90% co-insurance requirement. (Policy Property Suppl. Sched. CP 7163; Cov. Form sec. C.) A $5,000.00 deductible applies per any one occurrence of loss or damage. **Exhibit B** (Policy, Supplement Schedule CP 7162; Coverage Form sec. D.).

Covered Causes of Loss under the Policy are "Risks of Direct Physical Loss unless the loss is: 1. Excluded in Section B, Exclusions; or 2. Limited in Section C, Limitations." **Exhibit B** (Policy, Cause of Loss Special Form sec. A).

The Policy excludes "loss or damage caused by or resulting from … Wear and tear." **Exhibit B** (Policy, Special Form, sec. B.2.d.). The Policy does not provide coverage for "loss or damage caused directly or indirectly by … Continuous or repeated seepage or leakage of water, or the presence of condensation of humidity, moisture or vapor that occurs over a period of 14 days or more." **Exhibit B** (Policy, Special Cause of Loss Form, sec. B.2.f).

7

The Loss Payment provisions of the Policy provide for payment of the cost to repair, rebuild, or replace the property with other property of like kind and quality, subject to Harleysville's determination of:

> … the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**Exhibit B** (Policy, Coverage Form sec. E.4).

Plaintiff purchased optional Replacement Cost Coverage.   Under the Policy, Replacement Cost is limited to the least of: 1) The coverage limit applicable to the property; 2) The cost to replace the lost or damaged property with other property of comparable material and quality, and used for the same purpose; 3) The amount actually spent that is necessary to repair or replace the lost or damaged property.  **Exhibit B** (Policy, Coverage Form sec. G.3).

Loss to buildings is payable under the Policy on a Replacement Cost basis when the damaged property is actually repaired or replaced, and only if the repairs or replacement are made as soon as reasonably possible after the loss or damage.  **Exhibit B** (Policy, Coverage Form G.3.d.).

Obligations of the policyholder, in the event of a loss or damage to Covered Property include:

(1)  Notify the police if a law may have been broken.
(2)  Give us prompt notice of the loss or damage.  Include a description of the property involved.
(3)  As soon as possible, give us a description of how, when and where the loss or damage occurred.
(4)  Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim.  This will not increase the Limit of Insurance.  However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a

8

Covered Cause of Loss.  Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5)  At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6)  As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.  Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies of your books and records.

(7)  Send us a signed, sworn proof of loss containing the information we request to investigate the claim.  You must do this within 60 days after our request.  We will supply you with the necessary forms.

(8)  Cooperate with us in the investigation or settlement of the claim.

**Exhibit B** (Policy, Coverage Form sec. E.3).

If Harleysville and Plaintiff disagree on the amount of a loss, either may make written demand for an appraisal of the loss by a panel of three appraisers.  A decision agreed by any two of the appraisers is binding on the parties.  **Exhibit B** (Policy, Form sec. E.2).

## III.    <u>The Coverage Claim</u>

Plaintiff first informed Harleysville of its claim on July 19, 2011 when its Vice President, Chris Colardo, ("Colardo"), notified Plaintiff's insurance agency that the roof of the Property was damaged due to snow and ice buildup that had occurred on or about February 5, 2011.  **Exhibit Q** (Aff'd of T. DiSanto); **Exhibit R** (Accord Property Loss Notice, Bates Stamped HV00020-HV00021); **Exhibit C** (Affidavit of C. McLaughlin); **Exhibit O** (C. Colardo Deposition 67:7-9).

Plaintiff claimed that the damage to the roof was in the nature of Mansard Roof shingles that "lifted up" from the thawing and freezing of ice and snow, and that the damage to the shingles was permanent.  **Exhibit A** (Complaint ¶¶ 7, 8); **Exhibit R** (Accord Property Loss Notice, Bates Stamped HV00020-HV00021); **Exhibit C** (Affidavit of C. McLaughlin ¶ 4);

9

**Exhibit S** (Claim Notes dated July 20, 2011, Harleysville's Document Production Bates Stamped HV00004).

Donald Quinn of M&S Claim Services ("Quinn") inspected the Property on behalf of Harleysville on August 16, 2011 and provided a preliminary estimate dated September 30, 2011. **Exhibit T** (Quinn's Preliminary Estimate dated September 30, 2011).  Quinn observed damage to the shingles covering portions of the Mansard Roof and damage to the canvas awning. **Exhibit F** (D. Quinn Deposition 34:20-35:13, 36:6-22). Quinn prepared an estimate for replacement of the Mansard Roof shingles and Awning in the total amount of $20,854.05. **Exhibit T** (Quinn Preliminary Estimate dated September 30, 2011); **Exhibit F** (D. Quinn Deposition 33:18-20).  The Quinn estimate was provided to Plaintiff on or about September 30, 2011.  **Exhibit S** (D. Quinn Email to C. McLaughlin dated October 21, 2011, Harleysville Document Production Bates stamped HV00004).

On October 31, 2011 Quinn again inspected the Property in the company of Richard Juchnik ("Juchnik") of Multi-State Restoration, Inc., a public adjustor retained by Plaintiff. **Exhibit E** (Quinn Report & Estimate dated November 17, 2011).  During the meeting with Quinn on or about October 31, 2011, Juchnik asserted that there would be a problem matching the Main Roof shingles to the Mansard Roof shingles when the Mansard Roof shingles were replaced.  Juchnik did not assert that the Main Roof was damaged during the February 2011 storms, nor that it was damaged by any covered cause of loss.  **Exhibit E** (Quinn Report & Estimate dated November 17, 2011); **Exhibit I** (R. Juchnik Deposition 71:7-9).

On or about November 17, 2011 Quinn provided Harleysville a modified estimate for replacement of the Mansard Roof shingles and Awning.  The revised replacement cost estimate

10

was $25,334.21 – $21,581.21 of this total related to the Mansard Roof shingles replacement. **Exhibit E** (Quinn Report & Estimate dated November 17, 2011).

On January 11, 2012 Juchnick prepared a replacement cost estimate for the Mansard Roof shingles, the Awning, and for the replacement of the Main Roof shingles. The costs associated with each roof system and the Awning were not separated. The total amount of the Juchnik estimate was $107,827.67. **Exhibit U** (Juchnik Estimate, dated January 11, 2012). The Juchnik estimate was supplied to Harleysville on January 17, 2012. **Exhibit V** (T. Tarro Email to C. McLaughin, dated January 17, 2012).

On February 2, 2012 the Property was again inspected at the request of Harleysville. In attendance were David Grandpre of C.A. Pretzer Associates, Inc. ("Grandpre"), Gordon Chandler of Gordon Chandler Roofing and Consulting ("Chandler"), Donald Quinn, Chris Colardo, and Attorney Thomas Tarro, representing Plaintiff. **Exhibit W** (D. Quinn Email to C. McLaughlin dated February 3, 2012); **Exhibit H** (D. Grandpre Report).

Grandpre documented his inspection of the Property in a report dated February 9, 2012 (the "Grandpre Report"). **Exhibit H** (D. Grandpre Report). During the February 2, 2012 inspection, Grandpre observed that the Mansard Roof and the Main Roof did not match. "[T]he shingles applied to the mansard roof were newer and a different color than the shingles used on the main roof slope …. The mansard shingles were a slightly darker color than the main roof shingles." **Exhibit H** (D. Grandpre Report, p. 2). Grandpre also observed that "there were multiple different types and colors of roofing shingles found on the main roof slope" and that repairs had previously been made to the Main Roof in approximately twelve different locations. *Id*. at p. 2 and pp. 6-14; *see also* **Exhibit L** (D. Grandpre Deposition, 32:11-19, 43:11 – 44:12, 46:21-49:17). Grandpre observed further that "the roofing shingles on the main roof are

11

approaching the end of their useful life …. The shingles are drying out and curling, and there are small cracks in the shingles from this drying process." *Id.*

On February 2, 2012 Grandpre also observed missing or damaged shingles in four areas of the Main Roof, with the total number of missing or damaged shingles being approximately sixteen. *Id.*; *see also*, **Exhibit L** (D. Grandpre Deposition, 35:22 – 36:2).

Regarding the shingles on the Mansard Roof, Grandpre stated in his report that "[t]he mansard shingles did not appear to have been functionally damaged by winter conditions last year. The shingles were improperly installed and are not tight to the steep roof slope. If the poorly installed shingles were disturbed by ice last winter, causing some of them to swing out away from the roof decking, they can be repaired with the use of roofing cement." *Id.* at 3.

Chandler documented his February 2, 2012 inspection of the Property in a report dated February 6, 2012 (the "Chandler Report"). **Exhibit G** (G. Chandler Inspection Report and Estimate, dated February 6, 2012). Chandler observed that the Main Roof was white in color while the Mansard Roof was covered with "silver lining" shingles, and that the two roofs do not match. *Id.* at p. 2. Chandler also observed that the Main Roof had been repaired many times and that the replacement shingles on the Main Roof did not match other shingles on the Main Roof. *Id.* Chandler concluded that the damaged sections of the Mansard Roof could be replaced with "silver lining" shingles that would match the rest of the Mansard Roof, for a total cost of $5,600. He estimated the cost to replace all of the shingles on the Mansard Roof with "silver lining" shingles to be $17,500. *Id.*

On March 6, 2012, Harleysville communicated to Plaintiff that it would maintain its original offer of $25,334.21 for the cost of replacing the Mansard roof shingles and Awning, and that the actual cash value of this estimate ($18,876.32) continued to be offered pre-repair (less

the policy deductible of $5,000).  **Exhibit X** (C. McLaughlin Letter to Plaintiff, dated March 6, 2012).

On March 28, 2012, Harleysville reiterated its agreement to replace the Mansard Roof shingles and the Awning.  **Exhibit X** (C. McLaughlin Letter to Plaintiff, dated March 28, 2012).

Harleysville issued payment to Plaintiff in the amount of $13,876.32, which represents the actual cash value of the November 17, 2011 Quinn estimate, less the $5,000 deductible.  **Exhibit X** (C. McLaughlin Letter to Plaintiff, dated March 28, 2012); **Exhibit C** (Affidavit of C. McLaughlin, ¶ 9).

Under the terms of the Policy the depreciation amounts withheld are recoverable by Plaintiff if and when repairs are completed, subject to proper documentation and other Policy conditions. **Exhibit B** (Policy, Coverage Form sec. G.3); *see also* **Exhibit X** (C. McLaughlin Letter to Plaintiff, dated April 25, 2012).

On March 22, 2012, Harleysville notified Plaintiff of its desire to submit the dispute as to the replacement cost value of the Mansard Roof and awning to appraisal, pursuant to Property Coverage Form section E.2 of the Policy.[3] **Exhibit C** (Affidavit of C. McLaughlin, ¶ 6); **Exhibit T** (Claim Notes dated March 22, 2012, Harleysville's Document Production Bates Stamped HV00011).  Plaintiff's attorney, Thomas Tarro, argued that appraisal was not appropriate for this claim.  *Id.*

On or about May 4, 2012, Plaintiff provided to Harleysville an estimate prepared by Juchnik dated April 18, 2012 and addressing only the replacement of the Mansard Roof shingles and the Awning.  The total amount of the Juchnik estimate for replacement of the Mansard Roof

---

[3] In April 2014 and in June 2014, counsel for Harleysville, Robert D. Laurie, asked Plaintiff's counsel, Thomas Tarro, whether Plaintiff would proceed to appraisal to determine the cost to replace the mansard roof and awning. Attorney Tarro never responded to these requests.  **Exhibit Z** (Affidavit of R. Laurie ¶ 4).

shingles and awning was $64,457.62. **Exhibit Y** (R. Juchnik Estimate 2 dated April 18, 2012); *see also*, **Exhibit T** (Claim Notes dated May 4, 2012 reflecting Harleysville's receipt of Juchnik's estimate for the Mansard Roof and awning and totaling $64,457.62).

Plaintiff commenced this litigation on December 28, 2012 and alleged that Harleysville was in breach of contract for its failure to agree to the Juchnik replacement cost estimates for the Mansard Roof and Awning, and for its failure to replace the Main Roof to match the Mansard Roof.

Plaintiff completed its repairs to the Property in September of 2013, consisting of replacement of the roofing shingles on only the north face of the Mansard Roof, replacement of the Mansard Roof decking and framework on the north façade of the Property, and replacement of two small sections of Main Roof shingles and underlying decking and rafters on the north side of the Property.  **Exhibit M** (D. Scungio Deposition, 50:2-8, 60:6-61-2).

Harleysville was never formally notified of the decking and framework damage beneath the Mansard Roof, nor beneath the Main Roof.  **Exhibit C** (Affidavit of C. McLaughlin ¶ 10).

Harleysville learned of this damage, and of the repair work performed, during discovery in the litigation, on or about September 27, 2013.  **Exhibit P** (Plaintiff's Supplemental Responses to Request for Production); **Exhibit N** (Plaintiff's Supplemental Document Production, Bates stamp #70); **Exhibit O** (C. Colardo Deposition 147:13-148:10); **Exhibit C** (Affidavit of C. McLaughlin ¶ 11).

## LITIGATION AND PROCEDURAL HISTORY

Plaintiff commenced this litigation in the United States District Court for the District of Rhode Island on December 28, 2012.  The two count complaint asserts claims for breach of

contract and unfair claims practices / bad faith.  **Exhibit A** (Complaint).  On or about September 17, 2013, Count 2 was stayed pending resolution of the breach of contract claim.

In Count 1 Plaintiff alleges that the Property sustained physical damage in or about February 2011 caused by "excessive accumulation of ice and snow melting, thawing and freezing over a period of several days.  *Id*. at ¶ 7.  Plaintiff further alleges that **"the damage was to the mansard roof and the awning which was attached to the building entrance."**  *Id*. at ¶ 8.  Plaintiff alleges no damage to any other parts of the Property.

Plaintiff asserts that Harleysville "agreed to the damage to the awning and the mansard portion of the roof, however, the parties disagreed as to … the cost of replacement of the mansard and awning."  *Id*. at ¶11.  Plaintiff concedes that Harleysville tendered payment on the claim in the amount of $13,876.32 on or about April 17, 2012.  This payment reflected Harleysville's calculation of the actual cash value to replace the shingles on the Mansard Roof and replace the awning.  **Exhibit X** (C. McLaughlin Letter to T. Tarro dated March 6, 2012); **Exhibit C** (Affidavit of C. McLaughlin ¶ 9).  Plaintiff alleges that Harleysville is in breach of contract because it has not paid "for the replacement of the physical loss to the mansard roof and awning."  **Exhibit A** (Complaint at ¶ 14.

Plaintiff also alleges that the parties disagreed as to the need to replace the Main Roof, , and that Harleysville is in breach of contract because it declined to pay for replacement of the main roof in violation of Rhode Island Insurance Regulation 73 Section 8A(1) and (2).  *Id*. at ¶¶ 11, 13.  Plaintiff alleges an estimated total cost to "repair the damage" of $158,033.52.  *Id*. at ¶ 9.

Factual discovery in this action commenced in or about April 2013 and it was completed June 13, 2014.

## ARGUMENT

### I.   Legal Standard for Summary Judgment

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact" and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).

The moving party bears the initial burden of demonstrating it is entitled to summary judgment.  *Borges, ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010).  However, once the moving party has satisfied its burden, the opposing party must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve the issue in her favor.  *Id.*  As a general rule, that demonstration requires the opposing party to produce evidence that is 'significant[ly] probative."  *Id.*, *quoting Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247-48, 251-52 (1986).  "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; … only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. 242, 247-48.

In Rhode Island, the scope of coverage provided by an insurance policy is a question of law, which may properly be resolved by way of summary judgment.  *Derderian v. Essex Ins. Co.* 44 A.3d 122, 127 (R.I. 2012).  The terms of an insurance policy are to be interpreted in accordance with the rules of construction that govern contracts so that the terms used in the policy must be given their plain and ordinary meaning.  *Zarella v. Minnesota Mut. Life Ins. Co.*, 824 A.2d 1249 (R.I. 2003).  When the terms are found to be clear and unambiguous, the task of

judicial construction is at an end; the contract terms must then be applied as written and the parties are bound by them. *Malo v. Aetna Cas. and Surety Co.*, 459 A.2d 954 (R.I. 1983).

## II.  **Plaintiff's Breach of Contract Claims for the Replacement Cost Value of the Mansard Roof and Awning are Without Merit**

Plaintiff claims that Harleysville breached the Policy by refusing to pay for what it contends is the replacement cost value of the entire Mansard Roof and the Awning.  Harleysville is not contesting coverage for these portions of Plaintiff's claim.  Rather, a dispute exists between the parties over the cost to replace the Mansard Roof shingles and Awning.  As explained below, this dispute should be resolved by appraisal, a dispute resolution mechanism agreed to by the parties as part of the Policy.  Plaintiff has refused to submit the dispute over value to appraisal, in violation of the Policy.  Plaintiff cannot now recover for breach of contract when it – and not Harleysville – has refused to comply with the Policy terms.

### A.  **Valuation of Replacement Cost for the Repaired Section of the Mansard Roof is a Matter for Appraisal Under the Policy**

The dispute concerns the valuation of replacement cost.  This is in dispute, first, because the adjustors employed by the parties developed materially different estimates for the work.  Harleysville's adjustor, Donald Quinn, visited the Property twice and made a final estimate of $25,334.21 to replace all shingles on all faces of the Mansard Roof and the Awning.  Plaintiff's adjustor advanced a replacement cost of $64,457.62.  When this occurred, Harleysville sought to submit the dispute to a panel of appraisers, pursuant to section E.2 of the Policy Coverage Form.  **Exhibit C** (Affidavit of C. McLaughlin ¶ 6); **Exhibit Z** (Affidavit of R. Laurie, ¶ 4.  Plaintiff, in breach of its obligations under the Policy, refused to cooperate.

The second source of dispute for this portion of the claim concerns the cost of the shingles that Plaintiff already replaced on the north section of the Mansard Roof.  Again,

17

Harleysville does not contest that Plaintiff is owed the cost of these repairs. The dispute, however, centers on Plaintiff's failure to submit evidence of the value of the actual work performed by its contractor, in replacing the shingles on this section of the Mansard Roof. Plaintiff instead submitted non-itemized invoices for work done at the Property over the course of two months, and broadly covering his repairs to the Main Roof and to structural elements of the north face of the Mansard Roof, as well as the replacement of shingles on the Mansard Roof north face. The claimed value of the work/materials relating only to the shingle replacement on the Mansard Roof is not ascertainable.

It is precisely for situations such as this that the Policy appraisal provision exists. This provision allows either party to require the submission of the dispute to a panel of three independent appraisers and "a decision agreed to by any two will be binding." **Exhibit B** (Policy, Form sec. E.2). Appraisal provisions are common in property insurance policies, and they are favored by courts throughout the country. *See Newman v. Lexington Ins. Co.*, Civil Action 06-4668, 2007 WL 1063578 at *2 (E.D. La. Apr. 4, 2007) ("Courts have consistently held that appraisal provisions in insurance policies are enforceable."); *Mapleton Processing, Inc. v. Society Ins. Co.*, No. C12-4083-LTS, 2013 WL 3467190 at *20 (N.D. Iowa July 10, 2013) ("contractual appraisal is a favored private procedure because it serves as an inexpensive and speedy means of settling disputes") (internal citation omitted).

Thus, it is for the appraisers to reconcile the evidence and determine the replacement cost value of the shingling work done on the north face of the Mansard Roof. *See State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 895 (Tex. 2009) (affirming summary judgment to compel appraisal process under insurance policy appraisal clause with respect to roof damage); *Enger v. Allstate Ins. Co.*, 682 F. Supp. 2d 1094, 1098 (E.D. Cal. 2009) (dismissing plaintiff's complaint for

failure to exhaust the appraisal process provided for in the insurance policy); *Shifrin v. Liberty Mut. Ins.*, No. 1:12-cv-01011-JMS-DKL, 2014 WL 87877 (S.D. Ind. Jan. 9, 2014) (granting summary judgment for insurer who properly invoked an appraisal provision). Under the Policy, a replacement cost payment is limited to the lesser of:1) "The cost to replace the … damaged property with other property of comparable material and quality, and used for the same purpose;" or 2) "The amount actually spent that is necessary to repair or replace the … damaged property." **Exhibit B** (Policy, Coverage Form sec. G.3). The appraisers will determine these values and issue a decision based on the Policy requirements.

Harleysville must, and will, abide by the determination of the panel. But until the appraisers sit and resolve the valuation dispute, Harleysville cannot be, and is not in breach of any Policy obligations. Accordingly, Plaintiff's breach of contract claims, based on a disagreement as to the value of the completed work, are without merit and Harleysville is entitled to judgment on those claims, as a matter of law.

### B. Harleysville Has Breached No Policy Obligation With Respect To Covered Parts of the Property That Have Not Been Replaced

Plaintiff claims that Harleysville breached the Policy by refusing to pay the replacement cost of needed repairs. However, replacement cost coverage under the Policy is not triggered unless and until "the damaged property is actually repaired or replaced." **Exhibit B** (Policy, Coverage Form G.3.d.). The east, south, and west faces of the Mansard Roof have not been replaced by Plaintiff, nor has Plaintiff replaced the damaged awning. As such, Plaintiff is clearly not entitled to the replacement cost value of these parts of the Property.

To the extent that Plaintiff's claim could be characterized as based on a dispute as to the actual cash value of the east, south, and west faces of the Mansard Roof and of the Awning, then

it is a dispute that is also subject to appraisal, under the Policy.  The actual cash value payment

that Harleysville already made was based on the estimate to replace the entire Mansard Roof's

shingles and the Awning.[4]  Because the parties are not in agreement as to the estimated cost, it

would follow that they are not in agreement as to the depreciated actual cash value, either.  Thus,

although Plaintiff has not so pleaded, there is likely a dispute as to the actual cash value of the

un-replaced shingles on the east, south and west faces of the Mansard Roof and Awning.

Plaintiff is entitled to the actual cash value for these un-replaced elements, and Harleysville has

made a payment for this loss.  But, Plaintiff is also entitled to disagree with Harleysville's

determination of the value.  That disagreement must, however, be resolved through appraisal.

Unless and until a panel of appraisers addresses any disagreement Plaintiff has with

Harleysville's determination of the actual cash value of the un-replaced portions of the Mansard

Roof and the awning, Harleysville is not and cannot be in breach of its Policy obligations to

Plaintiff.  Accordingly, Plaintiff's claims relating to the value of these un-replaced elements,

however framed, are unsupportable.  Harleysville is not in breach of contract, and it is entitled to

summary judgment on these claims.

### III.    Plaintiff's Breach of Contract Claims Seeking Replacement of the Main Roof Are Without Support in the Law

Plaintiff claims the replacement cost value of the shingles on the Main Roof of the

Property.  This claim is not based on any allegation in the Complaint of damage to the Main

Roof.  Rather, the sole basis for Plaintiff's claim is that Rhode Island Insurance Regulation

73:8(A) (now 73:9) requires replacement of the Main Roof because it does not match the

Mansard Roof.

Rhode Island Insurance Regulation 11-5-73:9 provides in pertinent part:

---

[4] The "ACV" valuation, under the policy, is the same as a replacement cost valuation, less depreciation.

> When the Policy provides for adjustment and settlement of First Party
> Claimant losses based on replacement cost, the following shall apply:
>
> …. (2)  When a loss requires replacement of items and the replaced items do
> not match in quality, color or size, the Insurer shall replace all such items so
> as to conform to a reasonably uniform appearance.  This applies to interior
> and exterior losses.  The Insured shall not bear any cost over the applicable
> deductible, if any.

This regulation does not, in the first instance, support a private cause of action.

Moreover, even if Plaintiff could make a breach of contract claim, based on Regulation 73:9, Harleysville is already in full compliance with the Regulation, having agreed to pay the replacement cost of the entire Mansard Roof's shingles such that the Mansard Roof might maintain its uniform appearance.  The Main Roof never matched the Mansard Roof and no effort was made whatsoever while replacing the Mansard Roof during the summer of 2013 to match the Mansard to the Main Roof.  If there is a uniformity requirement, it applies only to the damaged Mansard Roof, and Harleysville handled the claim so that Mansard uniformity could be achieved.

### A.   There is No Private Cause of Action Under Regulation 73:9

Regulation 73:9 was adopted under the authority of R.I. Gen. Laws § 27-9.1-1, known as the Unfair Claims Settlement Practices Act (the "Act"), to "establish minimum standards for the investigation and disposition of property and casualty claims".  R.I. Admin. Code 11-5-73:2. The Rhode Island Administrative Code, as recently amended, clarifies that "[t]he various provisions of the [Unfair Claims Settlement] regulation are intended to define procedures and practices which constitute unfair claims practices" but "[n]othing herein shall be construed to create nor imply a private cause of action for violation of this regulation."  *Id*.; s*ee* R.I. Gen Laws § 27-9.1-1.

Violations of Regulation 73:9 are found only by the Rhode Island Director of Business Regulation, upon receipt of a complaint, and after an administrative hearing.  *See* R.I. Insurance Regulation 27-9.1-5 and 27-9.1-6.  The Regulations also specify, and limit, the available penalties for a violation of the unfair claims settlement regulations, if found by the Director.  *Id*. Nothing in the Act nor in the Regulations allows a claimant to bypass the prescribed administrative remedy and maintain claims in this Court under the Act.

Thus, the Rhode Island Supreme Court recently affirmed a summary judgment against a claimant asserting a violation of the Act, stating: "Clearly, the [Unfair Claims Settlement Practices Act], upon which defendant relies, does not provide him with a private cause of action."  *Great American E & S Ins. Co. v. End Zone Pub & Grill of Narragansett, Inc.*, 45 A.3d 571, 575 (R.I. 2012); *see Solomon v. Progressive Casualty Ins. Co.*, 685 A.2d 1073, 1075 (R.I. 1996) (complaint alleging unfair and deceptive trade practices in violation of the Act was without merit "by the express terms of the statute").

Whether Plaintiff frames its claim under Regulation 73:9 as "breach of contract" or non-compliance with Regulation 73:9, there is no cause of action, as a matter of law.  Regulation 73:9 is not an express provision of the Policy.  It is, instead, an obligation of a carrier wishing to do business in Rhode Island, enforceable only by the business regulatory authorities in Rhode Island.  The Act does not "create or imply" a private cause of action, Act, §27-9.1-1, and disguising the allegation as part of a breach of contract claim cannot alter the law.

## B.  Regulation 73:9 Cannot Operate to Require Replacement of an Un-Matched Building Component

Even if Regulation 73:9 imposed a heightened contractual duty upon insurers to replace damaged items so as to conform to a reasonably uniform appearance, Plaintiff's claim seeking

22

new shingles for the Main Roof would be without merit, as a matter of law.  Harleysville handled

this claim so that Plaintiff could replace the entire Mansard Roof with matching shingles, and

that approach was consistent with the requirements of the Act and Regulation 73:9.[5]

When Harleysville was put on notice of this claim in July of 2011 it promptly sent an

adjustor to inspect the Property.  **Exhibit R** (Accord Property Loss Notice, Bates Stamped

HV00020-HV00021); **Exhibit Q** (Affidavit of T. DiSanto); **Exhibit C** (Affidavit of C.

McLaughlin); **Exhibit S** (Quinn's Preliminary Estimate dated September 30, 2011).  Thereafter,

three more adjustors/roofing experts inspected the Property, paying particular attention to the

condition of the roofs.  Each person who inspected the roofs observed the difference in color,

between the shingles on the Mansard Roof and the shingles on the Main Roof.  **Exhibit I** (G.

Chandler Deposition Vol. I, 21:9, 22:4-6; **Exhibit G** (G. Chandler Inspection Report and

Estimate, dated February 6, 2012); **Exhibit J** (R. Juchnik Deposition 132:20-25); **Exhibit L** (D.

Grandpre Deposition 50:15-22); **Exhibit H** (D. Grandpre Report dated February 9, 2012,).

Three of the four inspectors noted that the Main Roof was not, itself, a uniform roof, consisting

instead of a hodgepodge of mis-matched shingles and varying repair techniques from work done

well before February of 2011.  **Exhibit I** (G. Chandler Deposition Vol. I, 21:9, 22:4-6; **Exhibit**

**G** (G. Chandler Inspection Report and Estimate, dated February 6, 2012); **Exhibit J** (R. Juchnik

Deposition 132:20-25); **Exhibit L** (D. Grandpre Deposition 50:15-22); **Exhibit H** (D. Grandpre

Report dated February 9, 2012, Photographs of Main Roof Repairs).  Indeed, Plaintiff's own

maintenance supervisor, Peter Zompa, who had patched the Main Roof himself on several

occasions, testified that the Main Roof was not of uniform style or color, and that the Main Roof

---

[5] Plaintiff did not make a claim with the Director of Business Regulation, as is required by one seeking redress under
Regulation 73:9.  Had Plaintiff done so, Harleysville would have vigorously defended its actions in the handling of
this claim as precisely meeting the requirements of Regulation 73:9.

and the Mansard Roof did not match.  **Exhibit K** (P. Zompa Deposition 31:24-32:19, 33:1-6, 32:4-7).

In addition, when Plaintiff undertook to repair the two roofs in 2013, it specifically elected to buy different colored shingles for the Mansard Roof and the Main Roof, despite previously asserting that it wanted "matched" roofs.  **Exhibit N** (Plaintiff's Supplemental Document Production, Bate Stamped #74-79); **Exhibit M** (D. Scungio Deposition 36:12-17, 38:4-6).  Indeed, although obtaining agreement from Harleysville that the replacement cost for the entire Mansard Roof was covered, and accepting an ACV payment for the entire Mansard Roof's shingles in advance, Plaintiff elected to replace only one face of the four-sided Mansard Roof such that the shingles on the Mansard Roof do not, today, exactly match (on account of the significant age difference of the shingles).  **Exhibit M** (D. Scungio Deposition 44:6-11).

In short, it is uncontroverted that the Property featured two separate roof systems, each treated differently by Plaintiff, and neither treated as if "matching" was a particular concern.  It should be obvious that Plaintiff's real motivation here is to replace its aged and worn Main Roof with a new one so as to better the condition of the Property.  The Policy requires only that covered damaged property be replaced with other property of "comparable material and quality … used for the same purpose."  **Exhibit B** (Policy, Coverage Form sec. G.3).  It does not provide for material betterment of the Property, especially in respect of building elements that did not even suffer from a Covered Cause of Loss.[6]

---

[6] Plaintiff has never made a claim for damage to the Main Roof as a result of a Covered Cause of Loss.  If it were to do so now, Harleysville would be prejudiced by the untimely notice.  Among other things, Harleysville would not now be able to inspect allegedly damaged sections of the Main Roof to ascertain if loss or damage was caused by a sudden covered event, or by wear and tear, or continuous or repeated seepage or leakage of water, both excluded under the Policy.

This is consistent with the intent of the Rhode Island Insurance Regulations.  Regulation 73:9 speaks to a loss that "requires replacement of items" and requires replacement of such items so that there is "a reasonably uniform appearance."  R.I. Admin. Code 11-5-73:9.  In the context of this claim, the items being replaced were damaged shingles on the Mansard Roof.  Thus, Harleysville was required to settle the claim so that the new shingles would reasonably conform in appearance to what was there, or if that was not possible, to replace all items that pre-repair had a reasonably uniform appearance.  The Regulation cannot be read to suggest that parts of a building that never matched should be made to match, at the expense of the carrier, so that the policyholder can improve the condition of the building.  Such an interpretation defies logic.

No Rhode Island court has interpreted Regulation 73:9, and certainly not under circumstances such as exist here, where a policyholder demands that two disparate and un-matched building elements be made to match.  Courts in other jurisdictions have considered related claims, however, and they have not stretched policy or regulatory language even to achieve precise matching of quality or color, let alone matching of elements that never matched before.

A U.S. District Court in Ohio recently found that a regulation quite similar to R.I. Insurance Reg. 73:9 did not require a carrier to replace an entire roof, when there was evidence that the existing wood shake roof had aged and faded, and that new shakes applied to a damaged section would, initially, be of a different color.  *See Wright v. State Farm Fire and Cas. Co.*, 2014 WL 627171 (6th Cir. Feb 18, 2014).  In support of its conclusion, the court noted that in the absence of evidence of special circumstances surrounding the particular roof, the policyholder's interpretation would "create an extreme blanket rule requiring the entire replacement of any damaged shake roof."  *Id*. at *3.  The Sixth Circuit upheld the decision of the trial court.  *Id*.

25

Likewise, in *Greene v. United Services Automobile Assoc.*, 936 A.2d 1178 (Penn. Sup. Ct. Nov. 20, 2007) the court affirmed a restriction of the replacement obligation of an insurer to one slope of a roof structure (rather than the entire roof) even though shingles exactly matching those on the entire roof were no longer available. *Id*. at 1186-1187. The court reasoned that the damaged slope was distinct from the rest of the roof within the meaning of policy language requiring replacement of "that part of the building damaged." *Id*. at 1186.[7] Interestingly, the appellate court highlighted the absurdity of the policyholder's argument by quoting the statement of the trial court that "to utilize [Appellants'] logic would necessitate replacing all siding when one piece of siding is damaged, or an entire door when a door knob is damaged. It defies common sense." *Id*.

Plaintiff's claim is much like a claim for a new door when a door knob is damaged, and it, too, defies common sense. It is much the worse because the old door, in our case, is worn and damaged from age and is beyond the end of its useful life. Plaintiff would "match" the Main Roof to the Mansard Roof only and exclusively so that it could obtain a windfall and upgrade the Property at little or no cost.[8] This is not what Regulation 73:9 allows, or even implies. Rather, it requires a reasonably uniform appearance of items within some ascertainable "part" of a structure, and the uncontroverted facts here establish that the Mansard Roof and the Main Roof are not the same "parts" of the Property. And, most important, where the two roofs were not designed to match and never matched, it would truly be absurd to apply Regulation 73:9 to render these parts of the Property uniform.

---

[7] The court also found that shingles of similar color and texture were available, such as would allow a repair of "like construction." *Greene*, 936 A.2d at 1186.

[8] Because the Policy includes a 90% coinsurance provision there is the possibility that recoveries by Plaintiff could be reduced, and the coverage is also subject to a $5,000 deductible, per loss occurrence.

Surely, under these circumstances, Regulation 73:9 could not create a cause of action for breach of contract.  Moreover, the relevant language in the Policy says nothing about rendering all parts of the Property uniform, simply because one already un-matched area becomes damaged.  Harleysville has already agreed to cover the replacement cost of the entire Mansard Roof, so as to ensure a reasonably uniform appearance within that part of the Property.  To require Harleysville to replace the roofing on another part of the Property is unsupportable, as a matter of law, and as such, summary judgment should be granted in favor of Harleysville on the "matching" claims in the action.

## IV. **Plaintiff's Claims for Replacement of Rotted Roof Structural Elements are Not Covered Under the Policy**

While undertaking to replace shingles on the Mansard Roof in 2013, Plaintiff's contractor discovered that the underlying framework and decking were damaged.  According to the contractor, David Scungio, the tar paper underneath the shingles was wet, and some of the plywood and underlying framework was rotted.  **Exhibit M** (D. Scungio Deposition 38:4-12, 41:21-42:3, 52:5-8, 68:1-69:12).  Scungio determined that the framing could not be repaired, but instead had to be replaced, so the entire framework for the north face of the Mansard Roof was removed, and replaced.  *Id*. at 60:3-9.  The damaged wood was disposed of while the work was in progress.  **Exhibit N** (Invoice for dumpster, Plaintiff's Supplemental Document Production, Bates Stamped #126-129).

Harleysville was not notified of the framing damage until after all of the work was completed and the new Mansard Roof was in place.  **Exhibit C** (Affidavit of C. McLaughlin ¶ 10).  Because of this delay, Harleysville never had the opportunity to investigate the damage, consider whether the rotted wood might be the result of a Covered Cause of Loss, or even

27

determine the reasonable value of the work performed.  **Exhibit AA** (Affidavit of D. Grandpre,

¶¶ 3-4).  Nonetheless, Plaintiff submitted to Harleysville invoices for the framing work, and

seeks the replacement cost value of replacing the Mansard Roof framing.

Likewise, Plaintiff undertook to replace shingles on sections of the Main Roof it had

never included in its coverage claims and upon finding damage to the underlying roof structure,

removed and replaced damaged plywood and joists without ever informing Harleysville.

**Exhibit M** (D. Scungio Deposition, 41:21-42:3, 50:13-51:12); **Exhibit O** (C. Colardo

Deposition, 146:13-147:5).  The damaged wood was removed from the site and destroyed, again,

without notice to Harleysville.  **Exhibit N** (Invoice for dumpster, Plaintiff's Supplemental

Document Production, Bates Stamped #126-129).  Indeed, Harleysville learned of the damage

and the repair only during the course of discovery in this action, approximately two months after

the work at the Property was completed.[9]  **Exhibit C** (Affidavit of C. McLaughlin ¶¶ 10, 11);

**Exhibit P** (Plaintiff's Supplemental Responses to Request for Production; **Exhibit N** (Plaintiff's

---

[9] By seeking to recover the replacement cost value of replacing one side of the Mansard Roof framing and decking, Plaintiff essentially asks the court and Harleysville to 'take its word' that the rotted wood is covered under the Policy.  However, contracts for insurance coverage do not operate by way of inferences and assumptions.  If any inferences are to be drawn from the damaged wood, those inferences should be **adverse** to Plaintiff's position. Indeed, by disposing of the damaged wood and framing, Plaintiff spoliated evidence necessary to determine whether the damaged wood was caused by a Covered Cause of Loss.  *Townsend v. American Insulated Panel Co.*, 174 F.R.D. 1, 4 (U.S.D.C. Mass. 1997) ("Spoliation is the intentional, negligent, or malicious destruction of relevant evidence.").  The United States District Court for the District of Rhode Island adopted a five-part inquiry for evaluating spoliation and imposing appropriate sanctions: (1) whether the defendant was prejudiced as a result of the loss of evidence; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the plaintiff was in good faith or bad faith; (5) the potential for abuse if the evidence is not excluded.  *Allstate Insurance Co. v. Creative Environment Corp.*, 1994 WL 499760 (D.R.I. 1994) (district court weighs factors and concludes that plaintiff's home heating expert should be precluded from offering his opinions concerning what had caused plumbing in the subject home to burst, thereby flooding the home, because the plaintiff had failed to preserve the burst pipe so that it could be inspected by the defendants).  Here, Plaintiff failed to inform Harleysville that it had discovered damaged wood framing and decking, and then Plaintiff disposed of the damaged wood.  Plaintiff's spoliation of the damaged wood would warrant sanctions of some kind at trial, as it is indisputable that Harleysville is prejudiced by the loss of evidence because it never had an opportunity to inspect and evaluate the damaged wood so as to determine whether the damage was due to a Covered Cause of Loss.

Supplemental Document Production, Bates stamped # 70); **Exhibit O** (C. Colardo Deposition, 147:13-148:10).

Plaintiff's late notice of the roof structure claims seriously prejudiced Harleysville. Harleysville had absolutely no opportunity to investigate the claim, under circumstances where there was nothing to suggest that the roof damage was caused at any particular time, by a potentially Covered Cause of Loss.  Likewise, Plaintiff's failure to allow Harleysville a reasonable opportunity to investigate these claims is a material and substantial breach of a clear Policy provision, given that an investigation was essential to determining if there could possibly be coverage for the damage.

    **A.  There is No Coverage Under the Policy for Damage to the Roof Decking and Structure Because Plaintiff Failed to Give Timely Notice and Harleysville was Seriously Prejudiced by That Failure**

The Policy clearly provides that the insured must give "prompt notice of the loss or damage" and must, as soon as possible, provide "a description of how, when and where the loss or damage occurred."  **Exhibit B** (Policy, Coverage Form sec. E.3).In an action on an insurance policy, "the plaintiff must prove that he has performed the conditions set forth in the contract."  *Daniel v. Pawtucket Mut. Ins. Co.,* 506 A.2d 1032, 1033–34 (R.I. 1986).  Surely, Plaintiff did not perform as required under the Policy.

Under Rhode Island law, however, a late notice provision in an insurance policy is effective to bar recovery only if there is "a showing by the insurance carrier that it was prejudiced by the breach."  *Pennsylvania Gen. Ins. Co. v. Becton*, 475 A.2d 1032, 1035 (R.I. 1984).  To determine whether an insurer was prejudiced by a failure to comply with a notice requirement, courts "look to the length of the delay, the reasons for the delay, and the probable prejudicial effect of the delay on the insurer."  *Id.  See also New*

*Hampshire Ins. Co. v. Arpin*, 842 N.E.2d 995 (Mass. App. Ct.  2006) (noting that the "loss of critical evidence" is a possible factor when considering the prejudicial effect of a delay in notice).

The Rhode Island Supreme Court has explained that clauses in insurance contracts requiring prompt notice exist "in order to facilitate the timely investigation of claims by bringing an event to the attention of the insurer allowing inquiry "before the scent of factual investigation grows old." *Avco Corp. v. Aetna Cas. & Sur. Co.*, 679 A.2d 323, 328 (R.I. 1996).  Thus, prejudice is often found where an insured's delay prohibits an insurer from investigating the insured's claim.  *See, e.g.*, *id.* (affirming summary judgment for four insurers when the delay in notice prevented them "from conducting any meaningful investigation"); *Pennsylvania Gen. Ins. Co.*, 475 A.2d at 1032 (finding trial court properly concluded that plaintiff's late notice of personal injury claim precluded insurer from investigating claim).

Unsurprisingly, a finding of prejudice due to late notice is often found when repairs are made to property before an insurer is given the opportunity to investigate the damage.  *See, e.g.*, *Yacht Club on the Intracoastal Condominium Ass'n, Inc. v. Lexington Insurance Co.*, 944 F.Supp.2d 1258 (S.D. Fla. 2013) (finding prejudice where repairs made without notice to the insurer, thus precluding the insurer from monitoring or cooperating with those repairs); *Atlantic Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F.Supp.2d 243 (S.D.N.Y. 2013) (demolition of roof before providing insurer with notice constituted prejudice); *Smagala v. Sequoia Ins. Co.*, 969 F.Supp.2d (D. Or. 2013) (granting summary judgment for insurer because it was prejudiced by the delay in notice of roof collapse since it prevented insurer from determining the cause of damage, which may have been due to intervening factors such as the nature of repairs and weather); *Hartford Ins. Co. v. Colonial Ins. Co.*, 750 A.2d 1158, 1161 (Conn. App. Ct. 2000)

30

(noting that the delay in notice "deprived the [insurer] of its opportunity to investigate the possibility that the damage was caused by the negligence of another roofer who followed the insured on the job"); *Kramer v. State Farm Florida Ins. Co.*, 95 So.3d 303 (Fla. Dist. Ct.  App. 2012) (affirming summary judgment for insurer where late notice prejudiced the insurer when the insured did not allow the insurer the opportunity to establish the extent of the damage before the resetting of tiles on roof); *Askren Hub States Pest Control Services, Inc. v. Zurich Ins. Co.*, 721 N.E.2d 270 (Ind. Ct. App. 1999) (affirming summary judgment for insurer where insured destroyed evidence of damage by repairing and replacing damaged portions of home so insurer was unable to conduct investigation); *New Hampshire Ins. Co.* at 995 (affirming summary judgment for insurer where insured had commenced repairs on garage prior to giving notice to insurer, resulting in material prejudice to insurer).

Thus, under facts very similar to those at issue here, a Connecticut court found that an insurer was prejudiced by an insured's failure to give prompt notice of a roof damage claim because no attempt was made to preserve damaged sections for inspection by the carrier. *Cornish Contracting and Real Estate, LLC v. Travelers Indemnity Co*., No. CV065001208, 2008 WL 1822528, at *7 (Conn. Super. Ct. Apr. 2, 2008).  The court reasoned that the carrier had a right to investigate the loss, including a right to inspect the damaged sections, and that the conduct of the policyholder had prevented the insurer from determining the cause of the damage. *Id.*

Likewise, in this case, although Plaintiff became aware during the late summer of 2013 that portions of the underlying roof structures were rotting and damaged it did not notify Harleysville of these conditions, nor preserve any of the evidence for inspection.  Rather, Plaintiff continued work at the Property and removed and disposed of the rotten wood.

Examination of the damaged wood was particularly important here.  Coverage for such damage could exist, under the Policy, only if there was direct physical damage to the wood structure caused by a Covered Cause of Loss.  Loss caused by gradual exposure of the wood to water is not covered.  **Exhibit B** (Policy, Special Cause of Loss Form, sec. B.2.f).  Thus, it was important to determine if the wood rot resulted from continuous or repeated exposure to water over time and to determine the period of time during which the wood decay occurred.  **Exhibit AA** (Affidavit of D. Grandpre ¶¶ 3-4).  Testing of this sort can be performed, evaluating various factors such as the extent and type of decay, and the particular form of fungus present (wood decay is caused by the presence of fungus, and exposure to moisture over time).  *Id*. at ¶ 4.

Often, wood decay requires many years of repeated exposure to moisture, and an expert may have determined that this damage was underway long before the February 2011 storms.  Likewise, if the damage was the result of chronic exposure to moisture, then Harleysville might have justifiably asserted that Plaintiff had failed to take reasonable steps to mitigate the damages as a result of some otherwise covered event that damaged the roofing shingles.  This is speculation, of course.  Harleysville never had the opportunity to examine the rotted wood and cannot know the extent of the damage, the moisture content of the wood, or the particular fungus that was present in the wood.  Absent the opportunity to inspect the Property and test the wood, it was impossible for Harleysville to determine the cause of the damage or the timeframe within which the damage occurred.  **Exhibit AA** (Affidavit of D. Grandpre ¶ 4).  Because the cause and timing of loss are essential to determining coverage, the failure to give prompt notice materially prejudiced Harleysville.

**B. Plaintiffs Further Breached the Insurance Contract by Failing to Give Harleysville the Opportunity to Investigate the Alleged Damage to the Underlying Roofing Components**

Even had Plaintiff provided adequate notice of the loss, the Policy requires further that the policyholder "cooperate with [the insurer] in the investigation or settlement of the claim."[10] Under Rhode Island law, "[o]rdinarily, an insured's failure to cooperate with the insurer after an occurrence giving rise to a claim against the insured creates a question of fact about whether the insurer has been so prejudiced by the insured's noncooperation as to permit the insurer to void the policy of insurance." *Ogunsuada v. General Acc. Ins. Co. of America*, 695 A.2d 996 (R.I. 1997). However, where an insured's "unexcused or unexplained failure to cooperate is itself sufficient to void the policy," the insurer is relieved of its liability without a showing of prejudice to the insurer. *Id*. at 1000. In order to relieve the insurer of its liability under the policy, an insured's breach of the cooperation clause must be substantial and material. *Id.*

Courts routinely bar recovery under insurance policies where an insured fails to cooperate with the investigation of a claim. *See, e.g.*, *Edwards v. State Farm Florida Ins. Co.,* 64 So. 3d 730 (2011) (affirming summary judgment for insurer regarding claim for roof damage where insured failed to submit to examination under oath and failed to submit documents that accurately reflect the amount of loss claimed); *Miles v. Great Northern Ins. Co.*, 671 F. Supp. 2d 231 (D. Mass. 2009) (granting summary judgment for insurer where insured's failure to answer insurer's questions or provide requested documents constituted material breach of insured's duty

---

[10] Similarly, the Policy requires the policyholder to give Harleysville the opportunity "to take samples of damaged and undamaged property for inspection, testing and analysis" and "if feasible, set the damaged property aside and in the best order for examination." The Plaintiff's removal and subsequent disposal of the damaged property constitutes a violation of both of these provisions. Even if the removal of the damaged portion was immediately necessary (which there is no evidence that it was), the Plaintiff's should have preserved the damaged wood so that Harleysville could inspect it. *See Hartford Steam Boiler Inspection & Ins. Co. v. Parker Gravel Co.*, 153 So. 547 (La. Ct. App. 2d Cir. 1934) (holding an insured's recovery is barred when an insured makes repairs to damaged property in violation of a provision permitting the insurer a reasonable time and opportunity to examine the damage before the property is repaired or removed).

to cooperate); *Powell v. United States Fidelity & Guaranty Co.*, 855 F. Supp. 858 (E. D. Va. 1994) (granting summary judgment for insurer where insured failed to provide a substantial amount of financial information material for insurer to investigate fraud suspicion); *Double G.G. Leasing, LLC v. Underwriters at Lloyd's, London*, 116 Conn. App. 417, 434 (2009) (affirming summary judgment for insurer where "the plaintiff failed to provide the defendant with requested information that the court properly deemed to be material to the investigation").

In *Pisa*, the United States District Court for the District of Rhode Island granted summary judgment to an insurer where it found that the insured could not establish an essential element of his cause of action under the insurance contract, which required the insured, among other things, to "submit to examinations under oath . . . and . . . produce for examination all books of account, bills, invoices and other vouchers . . . ." *Pisa v. Underwriters at Lloyd's, London,* 787 F. Supp. 283, 287 (D.R.I. 1992) *aff'd sub nom., Pisa v. Underwriters at Lloyds, London*, 966 F.2d 1440 (1st Cir. 1992)287.  The district court granted summary judgment for the insurer, finding that there was no dispute that the insured failed to produce information (e.g., business records, tax returns, bank statements) that the insurance contract required him to provide.  *Id.*

Similarly, in *Rolyn Companies, Inc. v. R & J Sales of Texas*, Inc., the 11th Circuit, applying Florida law, held that an insured failed to cooperate when it conducted repairs on a building without the consent of the insurer, noting that "there was no indication in the record that [the insured] was required to respond immediately to fix the damage."  *Rolyn Companies, Inc. v. R & J Sales of Texas*, 412 Fed. Appx. 252, 255 (11th Cir. 2011).[11]  The court found that this failure to cooperate "constitute[d] a material breach and substantially prejudice[d] the rights of

---

[11] While the insurance policy in this case included a voluntary-payment provision, the court determined that "the action of [the plaintiff] falls into the category of failing to cooperate with the insurer."  *Rolyn Companies, Inc.* at 255.

the insurer" because it appeared "obvious that the repair without consent would have a material effect on potential liability." *Id.*

Here, the failure of Plaintiff to cooperate with Harleysville is obvious and uncontroverted. Plaintiff repaired the damage discovered, and disposed of the damaged wood before Harleysville even knew a roof repair was underway, or knew that underlying structural elements were rotted. **Exhibit C** (Affidavit of C. McLaughlin ¶ 10). Harleysville was denied its right to investigate the potential claim because it was not even told that a potential claim existed. It had to learn of that during discovery, after the work was long finished and no evidence remained. **Exhibit C** (Affidavit of C. McLaughlin ¶ 10); **Exhibit N** (Plaintiff's Supplemental Document Production, Bates stamped #70); **Exhibit P** (Plaintiff's Supplemental Responses to Production).

Plaintiff elected to repair the roof and dispose of the evidence of damage without telling Harleysville, and that constitutes a substantial and material breach of the cooperation provision of the Policy. Without access to the damaged property, it was impossible for Harleysville to determine the cause and extent of the rot on the roof, which is crucial to a coverage assessment. Nor did Plaintiff do anything to establish the extent or cause of the rot, or document the conditions observed. Harleysville was left with virtually no information at all and no ability to reasonably investigate the claim.

Plaintiff has no excuse for its conduct. The roofs were not under repair on an emergency basis. Fully a year and a half had passed since damage to the Mansard Roof was originally discovered. The repair work spanned a period of many weeks. Nothing precluded Plaintiff from setting aside the rotted wood pieces for later inspection. This was not a situation where the evidence had to be destroyed as a result of mitigation of the loss

35

Harleysville was clearly prejudiced by Plaintiff's late notice and failure to cooperate. This court should find, as a matter of law, that the claims for replacement of the roof's structural elements are not covered.  The Policy requires prompt notice and cooperation precisely because Harleysville can be prejudiced if it loses the opportunity to investigate a claim, and that is exactly what happened here.

## CONCLUSION

In conclusion, for the reasons set forth above, Plaintiff's claims for the replacement cost value of the Mansard Roof shingles and Awning are properly addressed by a panel of appraisers and because Harleysville is not in breach of its Policy obligations, Plaintiff's breach of contract claims are without merit, as a matter of law.  Likewise, Plaintiff's claims for replacement of the Main Roof shingles and replacement of roof structural elements are not covered as a matter of law.  Accordingly, Harleysville respectfully requests that the Court enter an Order granting summary judgment in its favor, on all claims.

**DEFENDANT,**
**HARLEYSVILLE PREFERRED INSURANCE**
**COMPANY,**

By: /s/ Stephen Adams
    Stephen Adams / R.I. Bar No. 5577
    BARTON GILMAN LLP
    10 Dorrance Street, Suite 800
    Providence, RI  02903
    P: 401.273.7171 / F: 401.273.2904
    sadams@bartongilman.com

36

/s/ Robert D. Laurie
Robert D Laurie
SEIGER GFELLER LAURIE LLP
65 Memorial Road, Suite 340
West Hartford, CT 06107
P: 860.760.8405 / F: 860.760.8401
rlaurie@sgllawgroup.com
*Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2014, a copy of the foregoing was filed electronically and served by e-mail to all parties by operation of the court's electronic filing system.  Parties may access this filing through the court's ECF System.

  /s/ Stephen Adams
Stephen Adams (R.I. Bar No. 5577)

4839-4639-4909, v.  1